MHN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. STROJNY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> AMERICAN FAMILY MUTUAL ) <br> INSURANCE COMPANY, AMERICAN ) <br> FAMILY LIFE INSURANCE ) <br> COMPANY, AMERICAN STANDARD ) <br> INSURANCE COMPANY OF ) <br> WISCONSIN, and AMERICAN ) <br> FAMILY SECURITIES, LLC, ) <br> ) <br> Defendants. ) | Case No. 07-cv-2993 <br><br> Judge John W. Darrah |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff, Michael J. Strojny, brings this action against Defendants, American Family Mutual Insurance Company, American Family Life Insurance Company, and American Standard Insurance Company of Wisconsin (collectively, "American Family"). Two counts remain against American Family: Count I alleges breach of contract, and Count III alleges breach of an implied covenant of good faith and fair dealing. Presently before the Court is American Family's Motion for Summary Judgment on both counts. For the reasons set forth below, American Family's motion is granted.

## BACKGROUND

The following background information is derived from the parties' statements of material facts submitted in conjunction with American Family's Motion for Summary Judgment.[1] As an initial matter, many of Strojny's statements of fact must be disregarded for failing to meet the requirements of Federal Rule of Civil Procedure 56(e)(1), which provides that affidavits submitted in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Although Strojny states (in conclusory fashion) that he is competent to testify to all statements in his affidavit based on personal knowledge, he often fails to *show* that he is competent to testify to various factual assertions.

For example, Strojny states, "American Family agents in Illinois often advanced or paid premiums for their clients for various reasons, including where a customer forgets his checkbook or other forms of payment or where a policy is set to expire and the customer cannot be reached." (Pl. 56.1(b) ¶ 5.) Strojny's only support for this assertion is a paragraph in his affidavit containing that exact same language. Strojny fails to show evidence sufficient to support a finding that this statement – and many others like it – is

---

[1] Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

based on Strojny's personal knowledge. *See* Fed. R. Evid. 602. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (citation and internal quotation marks omitted) (affirming district court's decision to strike portions of affidavits consisting of "conclusory allegations").

After sorting through improper assertions and objections, the Court is left with the following undisputed, relevant facts. Strojny is a licensed insurance agent in the State of Illinois and worked as an agent of American Family from January 1, 1993, until January 25, 2007. (Def. 56.1(a) ¶ 1.) He is a Chartered Life Underwriter, who is trained in, and who trains others in, life insurance underwriting, policies, and rules. (Pl. 56.1(b) ¶ 2.) Until the events surrounding his termination in January 2007, Strojny was a very successful agent with no disciplinary or regulatory problems and no negative performance reviews. (Pl. 56.1(b) ¶ 3.)

One of Strojny's customers at American Family was Timothy Canty, a long-time customer of Strojny's for whom Strojny had effected over 100 transactions and written over 20 policies, including life, home, health, professional, and auto policies. (Pl. 56.1(b) ¶ 13.) Back in 1996, Strojny had obtained a $1 million, 10-year term life insurance policy for Canty through CNA Insurance. (P. 56.1(b) ¶ 14.) The bills for the policy were sent to Strojny's office and then forwarded to Canty's brother, the trustee of Canty's family trust. (Pl. 56.1(b) ¶¶ 15-16.) On January 19, 2006 (near the end of the term of Canty's CNA policy), CNA advised Strojny that Canty's premium would be increased to

$8,615. (Pl. 56.1(b) ¶ 18.) In an email dated May 6, 2006, Canty informed Strojny he could not afford to pay an $8,000 premium and that even half of that would be more than he wanted to pay. (Def. 56.1(a) ¶ 20.) Strojny told Canty he would attempt to procure a lower premium through American Family. (Pl. 56.1(b) ¶ 19.)

In June and July 2006, Strojny and Canty had several communications regarding the policy. (Pl. 56.1(b) ¶ 22.) On June 19, 2006, Canty agreed to and filled out an American Family Insurance Policy Application for a $1 million policy and took the requisite medical exam. (Def. 56.1(a) ¶¶ 22-24.) Strojny also signed and dated Canty's application. (Def. 56.1(a) ¶ 24.) On July 8, 2008, Canty sent an email to Strojny, saying that he believed he had been tested and signed everything necessary for a term life insurance estimate Strojny was preparing. (Def. 56.1(a) ¶ 25.)

On August 1, 2006, Strojny received notice from American Family that Canty's application was approved with an $8,290 premium. (Pl. 56.1(b) ¶ 25.) Strojny then informed Canty that his life insurance policy was issued with an $8,000 premium but that Strojny thought he could get a $4,000 rate and asked Canty if that would still be too much. (Def. 56.1(a) ¶ 26.) Around August 1, 2006, Strojny asked his District Manager, William Brennan, to help him obtain a lower rate for Strojny. (Def. 56.1(a) ¶ 27.) Strojny told Brennan that Canty would not buy any policy with an $8,000 premium and that even $6,000 would be too much. (Def. 56.1(a) ¶ 28.)

On August 23, 2006, Strojny paid $2,173, one quarter of Canty's $8,290 life insurance premium out of Strojny's agency special account. (*See* Pl. Resp. to Def. 56.1(a) ¶¶ 16, 19, 30.) (After an application is approved, the premium must be paid or

4

the application will be considered lapsed and the insured will have to reapply and possibly take another medical exam with no assurance of receiving the same premium. (Pl. 56.1(b) ¶ 28.)) Although Strojny never intended to allow Canty to keep the premium (Pl. 56.1(b) ¶ 30), Canty never reimbursed Strojny (Def. 56.1(a) ¶ 34). Indeed, Canty did not consent to – or even know of – Strojny's payment on his behalf. (Def. 56.1(a) ¶ 17.) Strojny created a billing statement for Canty, reflecting the $2,173 premium, but never sent it to Canty. (Def. 56.1(a) ¶ 33.)

On September 27, 2006, American Family changed the class on Canty's policy, which lowered his annual premium to $6,670. (Def. 56.1(a) ¶ 35.) Strojny knew that Canty did not want a policy with a $6,000 premium. (Def. 56.1(a) ¶ 36.) On September 29, 2006, American Family sent a letter to Canty, telling him that the quarterly premium on his life insurance policy had been reduced to $1,753.13 and enclosed a check for $420, the amount of the first quarter refund. (Def. 56.1(a) ¶ 52.) The letter also requested that Canty sign and date an illustration and return it to American Family's home office. (Def. 56.1(a) ¶ 52.) Instead, Canty wrote "I don't want this policy" on the check and sent it to Strojny. (Def. 56.1(a) ¶ 53.) Strojny then asked American Family to refund Strojny but changed Canty's mailing address on the life insurance policy to Strojny's office address. (Def. 56.1(a) ¶ 54.)

On November 30, 2009, Canty contacted American Family to discuss the life insurance policy that had been issued in his name. (Def. 56.1(a) ¶ 55.) Connie Kunick, an American Family employee, informed Canty that American Family would look into

the matter. (Def. 56.1(a) ¶ 56.) She then contacted Brennan and asked him to investigate. (Def. 56.1(a) ¶ 59.)

On December 12, 2006, Brennan went to Strojny's office. (Def. 56.1(a) ¶ 61.) Strojny admitted to Brennan that he placed Canty's policy by advancing Canty's quarterly premium out of Strojny's special account. (Def. 56.1(a) ¶¶ 62, 64.) Brennan relayed that information to Kunick and to Doug Stimeling, Strojny's State Sales Director. (Def. 56.1(a) ¶¶ 65-67.) On December 21, 2006, Kunick emailed Stimeling, informing him that American Family needed his assistance in investigating a situation involving Strojny and Canty's life insurance policy. (Def. 56.1(a) ¶ 69.) Kunick sent Canty an email on December 18, 2006, explaining that American Family would be closing out the policy as of the inception date of August 24, 2006. (Def. 56.1(a) ¶ 57.)

On December 27, 2006, Stimeling and Brennan met with Strojny in Stimeling's office; Strojny admitted that he had advanced premiums on other life policies and later collected the amounts due from his policyholders. (Def. 56.1(a) ¶¶ 70, 71.) The term "rebating" was not discussed. (Pl. 56.1(b) ¶ 37.) That same day, Stimeling prepared a memorandum to Strojny's file, documenting what occurred at the meeting. (Def. 56.1(a) ¶ 73.) The memorandum stated a theory that Strojny was taking new business to meet sales levels and then dropping the policies after the first of the year. (Pl. 56.1(b) ¶ 38.) American Family has no documents to support that theory, and Stimeling appears not to have pursued it further. (Pl. 56.1(b) ¶ 39.)

On January 15, 2007, Stimeling prepared a memorandum to Richard Steffen, Regional Sales Vice President, recommending that Strojny's Agent Agreement be

terminated because Stimeling believed Strojny participated in a form of rebating by advancing the premium on Canty's life insurance policy, which Stimeling believes to be prohibited by Section 4.i of Strojny's Agent Agreement. (Def. 56.1(a) ¶¶ 77, 78.) Stimeling made his recommendation based on documents he reviewed prior to, during, and after the December 27 meeting with Strojny and on the conversation he and Brennan had with Strojny at that meeting. (Def. 56.1(a) ¶ 74.) Steffen had authority to terminate Strojny's Agent Agreement and made the final decision that Strojny committed a form of rebating by advancing the premium on a life policy that an insured did not know was put in force, had not agreed to and indicated he did not want. (Def. 56.1(a) ¶¶ 79, 80, 84, 86, 87.) Brennan called Strojny on January 25, 2007, and told him that his agency was going to be terminated. (Def. 56.1(a) ¶ 93.) Brennan delivered a termination letter the next day. (Def. 56.1(a) ¶ 94.)

Strojny's Agent Agreement with American Family, which was effective from January 1, 1993, through the time of Strojny's termination in January 2007 (Def. 56.1(a) ¶¶ 11-12), contained the following provision (Section 6.h(2)) regarding termination:

> It is mutually agreed that: ...
>
> After two years from the effective date of this agreement or after the termination date of your Agent Advance Compensation Plan, whichever is later, the Company will give you notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. The Company will not terminate this agreement for those reasons for a period of six months after that written notice. *In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4.i or any other dishonest, disloyal or unlawful conduct*; nor shall any notice be required in the event that the Company terminates substantially all

agreements of this type throughout the Company or in a particular state or area.

(Def. 56.1(a) ¶ 10 (emphasis added)).

> Under the heading, "Mode of Conduct," Section 4.i provides:
>
> You agree: . . . To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of the Company to the best of your ability, to refrain from any practices competitive with or prejudicial to the Company and to abide by and comply with all applicable insurance laws and regulations.

(Def. 56.1(a) ¶ 10.)

> Under the heading, "Binding Provisions," Paragraph 7.c provides:
>
> Rates, rules, regulations and all provisions contained in the Company's Agent's Manuals and all changes to them shall be binding upon you. If any inconsistency or ambiguity exists between this agreement and such rate, rule, regulation, provision or other statement or statements, whether written or oral, this agreement shall control.

(Def. 56.1(a) ¶ 1.)

The agreement itself provides that it shall be interpreted and construed in accordance with the laws of Wisconsin. (Def. 56.1(a) ¶ 1.) But Strojny, as an agent doing business in Illinois, was subject to the insurance laws of Illinois, one of which provides, "[N]o insurance agent . . . shall . . . pay, directly or indirectly, any rebate of or part of the premium payable on the policy, or on any policy . . . or any other valuable consideration or inducement to or for insurance on any risk in this State . . . ." 215 ICLS 5/151. Violation of Section 151 is a Class B misdemeanor. 215 ILCS 5/152.

American Family's Life Compliance Manual, Life Reference Manual, and Life Compliance Guide also prohibit rebating. The Life Compliance Manual contains the following provision:

Rebating

\* \* \*

General Rules

- An agent may **not** pay or loan all or any part of an initial or renewal premium for a policy owner or a prospective client.

\* \* \*

FAQ (Frequently Asked Questions)

Can I pay a client's premium if they are a little short for a given month and I know they will be able to pay me back in a short period of time?

- No. This is rebating, and is taken very seriously by the Home Office and State Insurance Departments.

Can I use trust account dollars to pay the premium?

- Yes, but only if the agent have [sic] first deposited the agent's client's premium money into the trust account, and the amount of the client's deposit is sufficient to pay the premium.

(Def. 56.1(a) ¶¶ 45, 51.)[2]

American Family's Life Reference Manual provides, "No new or renewal premium should be advanced by the agent on behalf of any applicant or owner." (Def. 56.1(a) ¶ 49.) And the Life Compliance Guide provides, "An agent may not pay all or

---

[2] In his deposition, Strojny admitted that the Life Compliance Manual applies to all life policies and that he was subject to its provisions when selling life insurance. (Def. 56.1(a) ¶¶ 46-47.) Now, in an affidavit submitted with his opposition to American Family's Motion for Summary Judgment, Strojny claims he was not subject to the provisions in the LCM because "throughout Strojny's 15 years with the company it was common knowledge among agents and American Family that agents would often advance premiums in certain situations." (Pl. Resp. to Def. 56.1(a) ¶ 46.) This "common knowledge" is not supported by any admissible facts, and a party may not create a genuine issue of material fact by using a subsequent affidavit to contradict his earlier deposition testimony. *See Piscione v. Ernst & Young, L.L.P*, 171 F.3d 527, 532 (7th Cir. 1999). Therefore, the Court deems Strojny to have admitted that he was subject to American Family's Life Compliance Manual.

any part of an initial or renewal premium for a policy owner or a prospective client."
(Def. 56.1(a) ¶ 50.)

Upon Strojny's termination, his policies were distributed to various other American Family agents, including new, or rookie, agents. (Pl. 56.1(b) ¶ 48.) When life insurance policies are transferred to an agent from a terminated agent, the receiving agent receives no commission at all on the policy for the entire term; American Family retains the entire amount. (Pl. 56.1(b) ¶ 49.) Transferees of auto and home policies receive no commission for the first year and a reduced commission for the second through tenth years. (Pl. 56.1(b) ¶ 50.) American Family places emphasis on transferring policies to new agents and spends considerable time and money training and preparing those agents. (Pl. 56.1(b) ¶¶ 54, 55.)

Strojny has never advanced premiums on life insurance policies for the purpose of compiling points toward year-end bonuses or trips, to artificially increase a district manager's lapse rate or to obtain frequent flier miles on agents' credit cards; nor is he aware of any agent's being disciplined or reprimanded for such conduct. (Pl. 56.1(b) ¶¶ 10, 11.)

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (*Celotex*). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

In Count I of his Complaint, Strojny alleges that American Family breached the terms of his Agent Agreement by failing to provide him with written notice of any undesirable performance, by not refraining from terminating him for a period of six months after that written notice, and by failing to provide him with an opportunity to correct any performance deficiencies during that time. In Count III, Strojny alleges that

11

American Family acted arbitrarily, capriciously, and in bad faith when American Family terminated Strojny without notice. American Family contends that Strojny engaged in unlawful rebating and that notice was therefore not required to terminate his agreement.

*Count I*

"[T]he primary goal in contract interpretation is to determine and give effect to the parties' intention at the time the contract was made." *Farm Credit Servs. of N. Cent. Wis. v. Wysocki*, 627 N.W.2d 444, 448 (Wis. 2001). When the language is unambiguous, the court must apply its literal meaning. *Id.* Here, Strojny's Agent Agreement clearly provided that Strojny could be terminated without notice if he failed to "abide by and comply with all applicable insurance laws and regulations."

But Strojny does not challenge the interpretation of the Agreement; he challenges the interpretation of the Illinois law he allegedly violated. There is no dispute that the Agency Agreement between Strojny and American Family was a valid contract. Nor is there any dispute that Strojny had been an agent long enough to earn the protections afforded by Section 6.h(2) of the Agreement, which provided – with some important exceptions – that American Family would not terminate the Agreement without written notice of deficient performance and a six-month opportunity to correct any undesirable performance. There also is no dispute that Strojny paid a portion of Canty's life insurance premium without Canty's knowledge or consent. The sole dispute lies in whether Strojny's act of paying a portion of Canty's life insurance premium without Canty's knowledge constitutes unlawful rebating such that Strojny was not entitled to notice before being terminated.

12

Illinois's anti-rebating statute provides as follows:

> No company doing business in this State and ***no insurance agent or broker shall offer, promise, allow, give, set off or pay, directly or indirectly, any rebate of or part of the premium payable on the policy, or on any policy or agent's commission thereon or earnings, profits, dividends or other benefits founded, arising, accruing or to accrue thereon or therefrom***, or any special advantage in date of policy or age of issue, or any paid employment or contract for services of any kind or any other valuable consideration or inducement to or for insurance on any risk in this State, now or hereafter to be written, or for or upon any renewal of any such insurance, which is not specified in the policy contract of insurance, or offer, promise, give, option, sell, purchase any stocks, bonds, securities or property or any dividends or profits accruing or to accrue thereon, or other thing of value whatsoever as inducement to insurance or in connection therewith, or any renewal thereof which is not specified in the policy. . . .

215 ILCS 5/151(1) (emphasis added).

"It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms. *Middleton v. City of Chicago*, 578 F.3d 655, 658 (7th Cir. 2009) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)); *see also Blum v. Koster*, 919 N.E.2d 333, 338 (Ill. 2009) ("[T]he surest and most reliable indicator of legislative intent is the statutory language itself, given its plain and ordinary meaning.") (citation and internal quotation marks omitted). American Family argues that Section 5/151 expressly prohibits an insurance agent from paying a portion of a premium payable on a policy.

Strojny argues the plain meaning of the statute indicates that paying part of a premium is only unlawful if it was done with the specific intent to induce the policyholder into purchasing the policy. More specifically, Strojny argues that the phrase

13

"or any other valuable consideration or inducement to or for insurance" indicates that all of the preceding examples of conduct that constitutes rebating also must be inducements. But the statement regarding inducements is written in the disjunctive – it is a form of rebating separate and apart from "other valuable consideration" and separate and apart from paying part of a premium. Thus, all of the following acts constitute unlawful rebating: paying a portion of a premium, giving "other valuable consideration," and giving another "inducement to or for insurance." Use of the word "other" before "valuable consideration or inducement" does not limit all unlawful conduct to that which also qualifies as an "inducement." Rather, "other" simply modifies "valuable consideration," which logically indicates that payment of a premium is also "valuable consideration." Strojny admittedly paid part of Canty's premium and, thus, violated Section 5/151 according to its plain terms, regardless of Strojny's intent.[3]

Strojny also asserts knowledge of multiple instances where agents paid premiums without repercussion and avers that American Family was aware of that conduct such that American Family's policies were modified by ratification. However, Strojny supports this argument with little more than conclusory allegations not based on personal knowledge. (*See, e.g.*, Strojny Aff. ¶ 5 ("American Family agents in Illinois often advanced or paid premiums for their clients for various reasons, including where a customer forgets his checkbook or other forms of payment or where a policy is set to

---

[3] Strojny cites various cases in other jurisdictions interpreting antirebating statutes other than the one at issue in this case. As discussed in American Family's Reply Brief, these cases are inapposite, distinguishable, and not controlling. (Def. Reply Br. 10-11.) None of these cases involve the statute at issue and none holds that payment of an insurance premium without the policy holder's knowledge or consent is not rebating.

14

expire and the customer cannot be reached.") A self-serving, conclusory affidavit is insufficient to avoid summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

Indeed, Strojny's only evidence of such awareness by American Family is a single district manager's testimony that he knew of *one* agent who improperly placed a policy "long ago" and that the agent was not subject to an investigation because company procedure was not to investigate things like that. (Def. Resp. to Pl. 56.1(b) ¶ 12.) Even construing all reasonable inferences in Strojny's favor, this testimony is insufficient to infer a company policy of ignoring applicable insurance laws such that the express language of the Agreement did not apply to Strojny. Indeed, American Family's policy manuals specifically prohibit the very conduct in which Strojny engaged.

Strojny violated 215 ILCS 5/151 by paying a portion of Canty's life insurance premium. Therefore, American Family did not breach his Agreement by terminating Strojny without notice. No genuine issue of material fact remains that would allow Strojny to prevail on his breach-of-contract claim, and American Family's Motion for Summary Judgment is granted as to Count I.

*Count III*

In Count III, Strojny alleges that American Family breached the implied covenants of good faith and fair dealing owed to Strojny by preventing him from obtaining the benefits of the Agreement. Although Wisconsin law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing, the implied duty

cannot be used to defeat the express provisions of a contract. *Uebelacker v. Paula Allen Holding, LLC*, 464 F. Supp. 2d, 791, 803 (W.D. Wis. 2006).

Strojny argues that American Family's actual motivation for terminating him was profit and that Stimeling's investigation into Strojny's conduct was suspect. Strojny contends he was terminated just prior to reaching fifteen years with American Family and that his severance payment would have greatly increased after fifteen years. Strojny also asserts that American Family was financially motivated to distribute Strojny's accounts to rookie agents.

But again, Strojny offers no evidence to suggest that the decision to terminate him was based on anything other than his unlawful act of rebating. "[I]f a contract expressly provides a party with certain rights, exercising those rights cannot amount to a breach of the implied duty of good faith." *Id.* Any purported ulterior motives held by American Family do not negate American Family's contractual right to terminate Strojny without notice for engaging in unlawful conduct. Thus, no genuine issue of material fact remains as to Count III, and American Family is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, American Family's Motion for Summary Judgment is granted as to Counts I and III.

Date: February 26, 2010

JOHN W. DARRAH
United States District Court Judge